FILED

Dec 27 2017, 7:53 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Nikos C. Nakos
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Larry D. Allen
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Christine Marie Lindhorst, | December 27, 2017 |
| *Appellant-Defendant,* | Court of Appeals Case No. 02A03-1704-CR-696 |
| v. | Appeal from the Allen Superior Court. |
| State of Indiana, | The Honorable Frances C. Gull, Judge. |
| *Appellee-Plaintiff.* | Trial Court Cause No. 02D06-1510-F3-68 |

**Barteau, Senior Judge**

## Statement of the Case

Christine Marie Lindhorst appeals her convictions of battery resulting in serious bodily injury to a person less than fourteen years of age, a Level 3 felony;[1] and neglect of a dependent resulting in serious bodily injury, a Level 3 felony.[2] She also appeals the sentence imposed by the court. We affirm.

## Issues

Lindhorst raises three issues, which we restate as:

I. Whether the trial court abused its discretion in limiting Lindhorst's cross-examination of an expert witness.

II. Whether there is sufficient evidence to support Lindhorst's convictions.

III. Whether Lindhorst's sentence is inappropriate in light of the nature of the offense and the character of the offender.

## Facts and Procedural History

The parents of S.E., an infant girl, hired Lindhorst to babysit her at Lindhorst's house while they were at work. Lindhorst began taking care of S.E. when S.E. was eight weeks old. On the morning of May 26, 2015, two days before S.E.'s first birthday, S.E.'s father dropped her off at Lindhorst's house. At that time, S.E. could crawl, but she could not walk or climb, and she could not pull herself

---

[1] Ind. Code § 35-42-2-1 (2014).

[2] Ind. Code § 35-46-1-4 (2014).

up to a standing position. Her father recalled that S.E. appeared normal and healthy that morning, with no signs of injury.

[4] Later that morning, Lindhorst called S.E.'s mother to inform her that S.E. had fallen on a wooden floor "an hour ago" and had a "bump on her head." Tr. Vol. II, p. 80. She further stated S.E. had begun vomiting and she was taking her to the hospital.

[5] Lindhorst took S.E. to Dupont Hospital, arriving there at 11:36 a.m. Lindhorst told hospital staff that S.E. had been standing up and fell over onto a wooden floor two hours prior to arriving at the hospital. Nurse Cory Hentgen examined S.E. and saw swelling on the left side of her head. S.E. was responsive but fussy and irritable. S.E.'s parents arrived at the emergency room, and her father noted she had swelling on the left side of her head and was whimpering.

[6] Hospital staff took a CAT scan of S.E., which revealed she had a fractured skull and cerebral bleeding. After the scan, S.E. was less responsive to stimuli. Hospital staff sedated S.E., put her on a ventilator, and transferred her to Lutheran Children's Hospital. To Hentgen, S.E.'s injury seemed too severe to have resulted from a simple fall. In twenty years of working as a nurse, Hentgen had never seen such an injury result from a child falling over onto the floor. Hentgen notified Lutheran's staff that they needed to call Child Protective Services (CPS) for an investigation of the circumstances of her injury.

[7] S.E. arrived at Lutheran's emergency room at 1:39 p.m., where she was examined by Nurse Donna Ancil. Ancil saw redness and swelling on her head.

Ancil read S.E.'s chart and determined, based on her experience as a nurse trained in treating neurological injuries, that S.E.'s injury could not have resulted from merely falling over onto the floor. Instead, that type of injury was caused by "either a blow to the head or propulsion, as in a push and propulsion into something." *Id.* at 70-71.

[8] Several doctors examined S.E. and her scans. Dr. John Bormann, a radiologist, determined S.E. had a "depressed skull fracture," which is a "pretty significant injury" involving a portion of bone being pushed into the brain. *Id.* at 120. The bone fragment was depressed by four millimeters and caused bleeding that was putting pressure on the brain. Dr. Bormann later stated that such a head injury could only have been caused by a "high-velocity impact," such as a fall from ten to twenty feet onto hard ground, meaning concrete. *Id.* at 122. Falling from a standing position or even from a couch or bed would be "very unlikely" to cause the injury. *Id.* In over twenty years as a radiologist, Dr. Bormann had never seen an injury like S.E.'s caused by a fall onto the floor. To the contrary, an injury like this caused him to consider whether there was a "non-accidental" cause. *Id.* at 129.

[9] Dr. Jeffrey Kachmann performed emergency surgery on S.E. to relieve the cranial pressure, stop the bleeding, and correct the fracture. He cut out a piece of her skull and installed a temporary drain in her scalp to remove excess blood. Dr. Kachmann observed S.E.'s brain was contused "because of the tremendous impact of the force that occurred here." Tr. Vol. II, pp. 229-230. A large blood clot had formed, which had pushed the brain against the right side of the skull.

Based on his examination of S.E. and later seeing a picture of the floor where Lindhorst alleged the fall occurred, Dr. Kachmann concluded "there's no way, no way this injury could have occurred from that impact." *Id.* at 230.

[10] Dr. David Smith, a pediatric surgeon, examined S.E. on May 26, 2015, after her emergency surgery. He reviewed her CAT scan and other doctors' reports and examined her "head to foot." *Id.* at 138. He concluded S.E.'s skull fracture and resulting hematoma and retinal hemorrhages were caused by a "significant blow to the head" involving "a large amount of force." *Id.* at 139. Based on his experience, a ground-level fall or a fall from a couch or chair would not usually result in this severe of an injury. Simply falling onto the floor was "very unlikely" to cause S.E.'s injuries. *Id.* at 140. In his opinion, the injury was caused by "non-accidental trauma." *Id.* at 148. He further concluded that S.E.'s condition had been life-threatening, and she would have had visible symptoms of distress up to hours before arriving at the emergency room.

[11] S.E.'s father spoke with Lindhorst after he arrived at Lutheran. She told him the same thing she told S.E.'s mother and hospital staff: S.E. had fallen over onto a wooden floor. Meanwhile, police officers and CPS arrived at Lutheran to investigate the incident. Detective Randy Morrison spoke with S.E.'s parents and Lindhorst separately. Lindhorst told Detective Morrison that S.E. fell over onto a wooden floor and hit her head. She also told Morrison that S.E. vomited on her, but Morrison did not see or smell vomit on Lindhorst. Later that evening, Lindhorst gave a written statement to Detective Morrison, restating that S.E. was injured by falling onto the floor.

[12] After S.E.'s surgery, S.E.'s parents were barred from visiting S.E. at the hospital pending the results of CPS's investigation. S.E. stayed at Lutheran for a week. Lindhorst and S.E.'s father had a conversation via text messages during the week, and Lindhorst asked him "if we were pressing charges on her." *Id.* at 31.

[13] CPS would not allow S.E.'s parents to take her home after the hospital released her. Instead, she was placed in her uncle's custody for two days, until CPS ended its investigation. S.E.'s parents took her to follow-up appointments with her pediatrician and a pediatric neurologist. They also took her to an ophthalmologist to examine her retinal hemorrhages. As of the time of trial, S.E. had started walking and seemed to be developing normally, but there is permanent scarring on her brain tissue. As she ages, there is a risk that she will develop behavioral problems, learning difficulties, and long-term memory challenges that may require developmental services to address them.

[14] The State charged Lindhorst with battery resulting in serious bodily injury to a person under fourteen and neglect of a dependent resulting in serious bodily injury. The case was tried to the bench. The court determined Lindhorst was guilty as charged and sentenced her to six years on each conviction, to be served concurrently. This appeal followed.

# Discussion and Decision

## I. Cross-Examination

[15] Lindhorst argues the trial court erred in limiting her cross-examination of one of the State's expert witnesses about a medical journal and violated her federal and state constitutional right to confront witnesses. As we have previously stated:

> The Sixth Amendment right of confrontation requires that a defendant be afforded an opportunity to conduct a full, adequate, and effective cross-examination. In addition, the Indiana Constitution guarantees a defendant the right to face-to-face confrontation with witnesses against him. However, this right is subject to the reasonable limits a trial court may impose upon cross-examination. In such a situation, we will reverse only for a clear abuse of the trial court's discretion. In order to show the trial court abused its discretion, a defendant must prove that he was prejudiced by the limits imposed by the trial court.

*Belser v. State*, 727 N.E.2d 457, 463 (Ind. Ct. App. 2000) (citations omitted), *trans. denied*.

[16] In general, excerpts from a journal or treatise offered to discredit an expert's testimony would meet the definition of hearsay, which is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801. Hearsay evidence is not admissible unless it meets one of the exceptions set by statute or rule. Ind. Evidence Rule 802. One of the exceptions applies to treatises and periodicals, stating as follows:

> A statement contained in a treatise, periodical, or pamphlet [is not excluded by the rule against hearsay] if:

(A) the statement is called to the attention of an expert witness on cross-examination or relied on by the expert on direct examination;

(B) the statement contradicts the expert's testimony on a subject of history, medicine, or other science or art; and

(C) the publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice.

If admitted, the statement may be read into evidence but not received as an exhibit.

Ind. Evidence Rule 803(18).

[17] In the current case, Lindhorst cross-examined State's witness Dr. David Smith, and the following exchange occurred:

Q    You recognize though that the American Journal of Forensic Medicine and Pathology is a reliable source; would you agree?

A    I don't know anything about the journal, sir.

Q    You've never read the journal?

A    No, I do not read that journal routinely as a pediatric surgeon.

Q    Okay.  Are you familiar with Dr. Plunkett?

A    No, I am not.

Q    Do you know Dr. Plunkett to be a board-certified doctor in forensic pathology?

A    I am not familiar with Dr. Plunkett, I cannot stipulate to that.

Q    I'm gonna tell you, Doctor, that his study on fatal pediatric head injuries caused by short-distance falls states that physicians disagree on several issues regarding head injury in infants and children, including the potential lethality of short-distance fall, a

lucid interval in an ultimately fatal head injury, and specificity of retinal hemorrhage for inflicted trauma; do you agree with that statement?

Tr. Vol. II, pp. 153-54.

[18] The State objected to that question because Dr. Smith was unfamiliar with the Plunkett study. Lindhorst responded that she should be permitted to question Dr. Smith about the study under Indiana Evidence Rule 803(18), and she would "tie up later that it's a reliable, authoritative periodical." *Id.* at 154. The court sustained the State's objection "based on the fact that he has not read whatever journal it is that you had referenced." *Id.* at 155. Dr. Smith later stated he reads only the Journal of Pediatric Surgery.

[19] We find no abuse of discretion in the trial court's ruling. Indiana Evidence Rule 803(18) requires that a treatise must be "established as a reliable authority" by a witness or by judicial notice, and Dr. Smith specifically refused to agree that the Journal of Forensic Medicine and Pathology, in which Dr. Plunkett's article appeared, was a reliable source. Lindhorst's attorney stated he would demonstrate later in the case that the periodical was a reliable authority, but the court was not obligated to accept that statement. In the absence of authentication, the trial court did not err in limiting Lindhorst's questioning on this subject. *See U.S. v. Turner*, 104 F.3d 217, 221 (8th Cir. 1997) (no error in refusing to allow medical text into evidence; party did not offer any testimony to establish the text as authoritative).

In any event, Lindhorst must demonstrate the limits set by the trial court prejudiced her right to confront witnesses. Although Dr. Smith was unfamiliar with the Plunkett study, one of the State's other experts, Dr. Shannon Thompson, had read it. Lindhorst had the opportunity to cross-examine her on that study and others. In addition, Dr. Michael Weinraub testified on behalf of Lindhorst as an expert. Dr. Weinraub stated the Plunkett article was reliable and testified about the article's contents at length. Thus, the article was established at trial as authoritative, and its contents were read to the finder of fact through other witnesses. Any error in limiting Lindhorst's cross-examination of Dr. Smith did not prejudice Lindhorst's defense and was harmless. *See Koenig v. State*, 933 N.E.2d 1271, 1274 (Ind. 2010) (erroneous admission of out-of-court lab report, in violation of defendant's right to confront witnesses, was harmless considering other evidence presented).

## II. Sufficiency of the Evidence

Lindhorst argues there is insufficient evidence to support her convictions, describing the State's case as "speculation and conjecture." Appellant's Br. p. 13. We will affirm a conviction if, after considering only the probative evidence and reasonable inferences supporting the verdict, we conclude that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Lush v. State*, 783 N.E.2d 1191, 1195 (Ind. Ct. App. 2003). We will not reweigh the evidence or assess witness credibility. *Id.* It is not necessary that the evidence overcome every reasonable hypothesis of innocence. *Lay v. State*, 933 N.E.2d

38, 41-42 (Ind. Ct. App. 2010), *trans. denied*. Further, a conviction may be sustained based on circumstantial evidence alone. *Id.* at 42.

[22] To obtain a conviction for battery of a person under fourteen years of age resulting in serious bodily injury, a Level 3 felony, the State was required to prove beyond a reasonable doubt that Lindhorst (1) was a person at least eighteen years of age (2) and knowingly or intentionally (3) touched (4) a person under fourteen years of age (5) in a rude, insolent or angry manner (6) resulting in serious bodily injury to the child. Ind. Code § 35-42-2-1. The key evidentiary question for this conviction is whether S.E.'s life-threatening injury resulted from Lindhorst knowingly or intentionally touching her in a rude, insolent, or angry manner.

[23] To obtain a conviction for neglect of a dependent resulting in serious bodily injury, a Level 3 felony, the State was required to prove beyond a reasonable doubt that Lindhorst (1) had the care of a dependent and (2) knowingly or intentionally (3) placed the dependent in a situation endangering the dependent's life or health (4) resulting in serious bodily injury. Ind. Code § 35-46-1-4. The accused must have been subjectively aware of a high probability that he or she placed the dependent in a dangerous situation. *Armour v. State*, 479 N.E.2d 1294, 1297 (Ind. 1985). The key evidentiary question for this conviction is whether Lindhorst knowingly or intentionally placed S.E. in a situation endangering her life.

[24]     The evidence most favorable to the judgment indicates S.E. was not injured in the manner described by Lindhorst, specifically that she fell over onto a wooden floor. Every one of the State's expert witnesses explained that, at the least, it was extremely unlikely that S.E.'s injury resulted from a mere ground-level fall. Dr. Bormann stated that only a high degree of force could have caused the injury, such as the force involved in falling ten or more feet onto a hard surface such as concrete. Detective Morrison noted that when he walked across Lindhorst's wooden floor, it had "a little bit of give." Tr. Vol. II, p. 249.

[25]     In addition, both emergency room nurses who examined S.E., as well as Dr. Bormann and Dr. Thompson, had never seen such a severe skull fracture result from a mere fall to the floor. Dr. Kachmann concluded "there's no way, no way this injury could have occurred" from falling over onto a wooden floor. *Id.* at 230. Dr. Thompson further explained that the location of S.E.'s injury on the side of her head did not match Lindhorst's explanation because injuries from a child's fall tend to appear on the front or back of the head. The injury is further remarkable because S.E., who was almost one year old, was not able to walk, climb, or pull herself up to a standing position at that time.

[26]     In further contrast to Lindhorst's explanation for S.E.'s injury, Dr. Smith stated S.E.'s injury was caused by "non-accidental trauma." *Id.* at 148. Dr. Bormann similarly thought a non-accidental cause should be considered. S.E.'s pediatrician, Dr. James Steigmeyer, testified the most likely cause of the injury was "blunt force trauma to the head." *Id.* at 213. Lindhorst was the only adult present when S.E. sustained her injury.

[27] Further, the evidence shows Lindhorst unnecessarily delayed seeking treatment for S.E.'s life-threatening injury by as much as two hours. Several doctors testified S.E. would have displayed obvious serious symptoms soon after being injured, including:

> inconsolable crying . . . loss of consciousness or lethargy or just sleepy and not moving, not really wanting to do anything, vomiting, seizure activity, or just sometimes problems with breathing itself. A lot of those things aren't immediate, but after that-the kind of injury she had with the large skull fracture, I would have at least have expected her to be inconsolable crying and at least sleepy fairly quickly.

*Id.* at 181. Dr. Thompson "found it difficult to believe" that S.E. would seem normal for up to an hour after sustaining such a grievous injury. *Id.*

[28] Finally, Lindhorst stated she took S.E. to the hospital after she began vomiting, and that S.E. vomited on her clothes, but Detective Morrison did not see or smell any vomit on Lindhorst when he interviewed her at Lutheran in a small, enclosed conference room.

[29] It is perhaps possible that S.E.'s injury was caused by an unusual "freak" accident, as described by Lindhorst. Tr. Vol. III, p. 144. But the finder of fact determined otherwise, and we may not reweigh the evidence as Lindhorst requests. There is sufficient evidence to support the trial court's determination that Lindhorst knowingly or intentionally inflicted the injury upon S.E. and that Lindhorst knowingly or intentionally placed S.E. in a dangerous situation by delaying medical assistance. *See Hughes v. State*, 508 N.E.2d 1289, 1296 (Ind. Ct. App. 1987) (affirming conviction for battery on a child; sufficient

circumstantial evidence established defendant battered the victim, despite defendant's claim the victim fell out of a crib), *trans. denied*; *Sample v. State*, 601 N.E.2d 457, 459-60 (Ind. Ct. App. 1992) (evidence sufficient to support conviction of neglect of a dependent; defendant unreasonably delayed getting medical help for infant in her care).

## III. Sentencing

[30] Lindhorst asserts her sentence is inappropriately high and asks the Court to reduce it to a term of six years, but with one year suspended and five years of probation. In other words, she does not object to the length of her sentence but argues she should serve it outside of prison.[3]

[31] In general, sentencing decisions rest within the sound discretion of the trial court and are reviewed on appeal for an abuse of discretion. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (2007). Even if a trial court imposes a sentence within its discretion, the Court retains constitutional authority to review and revise sentences. Ind. Const. art. 7, § 6. This constitutional authority is implemented through Indiana Appellate Rule 7(B), which provides we "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence

---

[3] Lindhorst also states in passing that the trial court abused its discretion in sentencing her, but her substantive arguments are directed solely to this Court's power to revise sentences. We thus decline to consider whether the court abused its discretion.

is inappropriate in light of the nature of the offense and the character of the offender."

[32] The principal role of sentencing review under Appellate Rule 7(B) is to attempt to leaven the outliers. *Perry v. State*, 78 N.E.3d 1, 12 (Ind. Ct. App. 2017). The appellant bears the burden of demonstrating the sentence is inappropriate. *Id.* at 13. We may consider not only the aggravators and mitigators found by the trial court, but also any other factors appearing in the record. *Walters v. State*, 68 N.E.3d 1097, 1101 (Ind. Ct. App. 2017), *trans. denied*.

[33] The advisory sentence is the starting point in determining the appropriateness of a sentence. At the time Lindhorst committed her offenses, the advisory sentence for a Level 3 felony was nine years, with a minimum sentence of three years and a maximum sentence of sixteen years. Ind. Code § 35-50-2-5 (2014). The court sentenced Lindhorst to six years for each offense, to be served concurrently, resulting in an aggregate sentence well below the advisory amount set by statute.

[34] The nature of the offense is found in the details and circumstances of the offenses and the defendant's participation. *Perry*, 78 N.E.3d at 13. In this case, Lindhorst inflicted a grievous, potentially fatal injury on a helpless infant in her care and delayed seeking medical help. Although doctors saved S.E.'s life and she appears to be developing normally at this point, her brain has suffered permanent scarring. As S.E. ages she may experience behavioral problems, learning difficulties, and long-term memory challenges.

The character of the offender is found in what we learn of the offender's life and conduct. *Id.* (quotation omitted). Lindhorst, who was thirty-seven years old at the time of sentencing, had no prior criminal history and had custody of five children. In addition, her friends submitted almost sixty letters of support to the trial court, which demonstrates she has substantial support in the community. Despite these positive factors, she committed two Level 3 felonies which have the potential to harm S.E. for the rest of her life. We agree with the trial court that a sentence without executed time would "greatly depreciate" the seriousness of the crimes. Tr. Vol. III, p. 216. As a result, we cannot conclude Lindhorst's six-year executed sentence, which is well below the advisory amount, is inappropriate.

# Conclusion

For the reasons stated above, we affirm the judgment of the trial court.

Affirmed.

Kirsch, J., and Crone, J., concur.