## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 24 2019, 7:44 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Donald J. Frew
Ft. Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Laura R. Anderson
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Cornell Montgomery
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

May 24, 2019

Court of Appeals Case No.
18A-CR-2487

Appeal from the Allen Superior Court

The Honorable Frances C. Gull, Judge

Trial Court Cause No.
02D05-1711-F3-65

**Robb, Judge.**

# Case Summary and Issues

[1] After a period during which Cornell K. Montgomery, Jr. was alone with his then seven-month old daughter, A.M., he dropped A.M. off at the home of her maternal grandmother, Aundria Allison. Allison noticed A.M. was acting unusually and as if she was in extreme pain. A.M. was taken to the emergency room where she was diagnosed with a broken femur and further x-rays showed A.M.'s left ankle was healing from an older fracture. Following an investigation by the Indiana Department of Child Services ("DCS") which ruled out accidental causes, Montgomery was charged with battery resulting in serious bodily injury and neglect of a dependent resulting in serious bodily injury, both Level 3 felonies.

[2] During jury selection, Montgomery raised a *Batson* objection to the State's attempt to strike an African American from the jury pool. The trial court denied the *Batson* objection, the prospective juror was stricken, and a jury found Montgomery guilty as charged. Montgomery was sentenced to two twelve-year sentences to be served concurrent with each other but consecutive to his sentence in another cause. Montgomery now appeals his convictions and sentence, raising three issues for our review which we expand and restate as four: (1) whether the trial court violated his constitutional right to an impartial jury by denying his *Batson* objection and allowing the State to strike a prospective African-American juror; (2) whether the evidence was sufficient to support his convictions; (3) whether the sentence was inappropriate in light of the nature of the offenses and his character; and (4) whether the trial court

abused its discretion in ordering his concurrent sentences to be served consecutive to his sentence in another cause. Concluding that the trial court did not violate Montgomery's constitutional right to an impartial jury, the State presented sufficient evidence to support his convictions, his sentence is not inappropriate, and the trial court did not abuse its discretion in ordering consecutive sentences, we affirm.

# Facts and Procedural History[1]

[3] Around 6:30 a.m. on May 23, 2017, Allison Facetimed with her daughter, Khashira Jones, and A.M. for a little over a half an hour. A.M. was acting "just normal" and bouncing in her bouncy seat during the Facetime call. Transcript, Volume 2 at 99. After the call ended, Montgomery placed A.M. in her car seat and drove Jones to work by 8:00 a.m. Within an hour, Montgomery called Jones at work stating that he had an outstanding arrest warrant. Montgomery told Jones to contact Allison so that she could babysit A.M.

[4] Around 9:00 a.m., Jones called Allison and informed her that Montgomery was going to drop A.M. off at her house so that she could babysit A.M. because Montgomery "had to take care of something." *Id.* at 92. Montgomery arrived at Allison's house while Allison was still on the phone with Jones.

---

[1] We heard oral argument in this case on April 15, 2019, at DePauw University. We commend counsel for their advocacy and thank DePauw's faculty, staff, and students for their participation and hospitality.

Montgomery sat A.M., who was still in her car seat, on a futon. About ten minutes later, Allison went to remove A.M. from the car seat and A.M. began to cry abnormally. Allison noticed that A.M. only cried when she was moving and would stop crying if she was held still. Montgomery stated that he did not know what had happened to A.M.

[5] Jones left work early to attend to A.M. When Jones arrived, she sat A.M. on Montgomery's lap and took off A.M.'s pants. A.M.'s "leg was just dangling. You could tell something was wrong cause [sic] it was just . . . hanging there limp." *Id*. at 96. Jones decided to take A.M. to the hospital and called a friend for a ride. Montgomery stayed at Allison's house and did not accompany them to the hospital.

[6] A.M. was brought to the emergency room at Parkview Hospital Randallia, where Dr. Sara Brown noted swelling in the middle of A.M.'s right thigh and that A.M. would cry and scream in pain if the leg was moved. Dr. Brown ordered an x-ray and pain medication for A.M. The x-ray revealed that A.M. had suffered a mid-shaft femur fracture, with the break extending completely through the bone such that the bone was displaced and angulated, meaning it was broken in two and the two ends overlapped each other. Due to the nature of the injury and the lack of patient history indicating accidental trauma, Dr. Brown diagnosed A.M.'s injury as the result of abuse or non-accidental trauma. Dr. Brown ordered a "skeletal survey" to see if A.M. had any other broken bones. *Id*. at 135. The skeletal survey revealed a buckle fracture at A.M.'s left ankle. A.M. was then transferred to the trauma center at Parkview Regional

Medical Center ("Parkview Regional") so that she could be treated by physicians specializing in trauma, pediatrics, and orthopedics. Dr. Brown also reported the case to DCS.

[7] A.M. was admitted to Parkview Regional to have a surgical procedure that entailed placing a cast on A.M. from her chest to her lower ankle in order to immobilize her broken leg and facilitate healing. A.M. was placed under anesthesia for the procedure. Unfortunately, she aspirated and went into cardiac arrest. CPR was performed, and A.M. had to be intubated and placed on a ventilator. The doctors were able to stabilize A.M.'s breathing. Once they had done so, the surgical procedure was completed successfully.

[8] DCS opened an investigation into A.M.'s injuries. A pediatric specialist reviewed A.M.'s file and, after noting the absence of accidental trauma and the fact that A.M. did not have any relevant preexisting conditions, she opined the injury occurred due to child abuse. Based upon the specialist's opinion, DCS removed A.M. from the home.

[9] After initial attempts to locate Montgomery failed, a DCS caseworker interviewed Montgomery at the child in need of services ("CHINS") hearing held on May 25, 2017. Montgomery stated that A.M. was "fine" on the morning in question and that he suspected A.M. had broken her femur in the "jumper that she played in and jumped around in." *Id*. at 179. When asked why he did not take A.M. to the hospital, Montgomery stated that "his vehicle

wasn't in good shape and that he only used it for emergency purposes[.]" *Id*. at 180.

[10]     Following the CHINS hearing, Montgomery was arrested on an outstanding warrant and transported to the police station where he was interviewed regarding A.M.'s injuries. Montgomery admitted that A.M. had been fine leading up to May 23, 2017, but claimed he did not notice anything unusual about her behavior until she was removed from her car seat at Allison's house later that morning. Montgomery explained he was surprised that A.M. never cried as if in pain and again explained that he did not take A.M. to the hospital because his car was unreliable, and he only drove it in emergencies. Montgomery also recalled that A.M.'s leg had become stuck in her crib a few weeks before as a possible explanation for her injuries.

[11]     The State charged Montgomery on November 14, 2017, with battery resulting in serious bodily injury and neglect of a dependent resulting in serious bodily injury, both Level 3 felonies. A three-day jury trial commenced on August 7, 2018. During voir dire, Montgomery raised a *Batson* objection to the State's attempt to strike an African American from the jury pool. The trial court denied the *Batson* objection, and the prospective juror was stricken.

[12]     At the conclusion of the trial, a jury found Montgomery guilty as charged. A sentencing hearing was conducted on September 14, 2018. The trial court imposed two twelve-year sentences for the battery and the neglect of a dependent convictions to be served concurrently but consecutive to

Montgomery's sentence in another cause. Montgomery now appeals his convictions and sentence. Additional facts will be supplied as necessary.

# Discussion and Decision

## I. Batson Claim

Montgomery first argues that the trial court erred when it allowed the State to use a peremptory challenge to strike an African-American potential juror in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Due to the alleged fault of the trial court, Montgomery asks this court to "vacate" the trial court's decision and "remand[] for further proceedings[.]" Brief of Appellant at 16.

### A. Underlying Facts

During jury selection at Montgomery's trial, the State commenced voir dire by asking the first venire panel of twelve prospective jurors if they could give both the State and Montgomery a fair trial. The State then engaged in the following colloquy:

> [State]: The information in this case is a battery. That's when someone knowingly and intentionally touches another person and that results in injury. In this case it's serious bodily injury. And in this case the victim is well under the age of fourteen (14) and the defendant is over the age of eighteen (18). Based on that charge, is there any of the twelve (12) of you that believe that you could not sit and listen to the

> evidence that's presented . . . and apply that to the law?
>
> [Jurors]:      (Several Jurors raise hands).
>
> [State proceeded to ask Jurors 42, 139, and 175 follow-up questions]
>
> [State]:      Okay.  And there was someone in the back.  Oh, this gentleman here.
>
> [Juror 78]:   (Inaudible).
>
> [State]:      Okay.  Based on the nature of the charge or?
>
> [Juror 78]:   (Inaudible).

Tr., Vol. 2 at 21, 22-23.  Defense counsel then proceeded to conduct voir dire.

> [Defense]:    Juror number 78, . . . , when [the State] asked you . . . about the nature of the offense and the allegations you said you might not be able to be fair, is that correct?
>
> [Juror 78]:   I said I'm a single parent with custody of a child, so.
>
> [Defense]:    Gotcha.  I didn't hear that, sir, so I appreciate your reiteration then, thank you.  So[,] to underscore do you think you could be fair then to Mr. Montgomery?

[Juror 78]: Um, that's based on the circumstances. Like if you're hearing certain situations it hits home, so I mean I honestly (inaudible).

[Defense]: Thank you for your honesty, sir, I appreciate that. . . .

*Id.* at 37.

At the end of voir dire on the first venire panel, the State moved to strike Juror 78 for cause.

[The State]: When I was questioning him[,] I thought that he made it clear when I was questioning him that it was that he didn't think he could be fair. And then I think when [the defense was] questioning him he kind of rehabilitated a little bit.

[The Court]: Umhuh (affirmative response).

[The State]: So that – that was my reason for that cause, cause I – I thought he said he couldn't, but then he –

[The Court]: And you gave him –

[Defense]: Yeah, I asked him, he said well it would just be personal, it would be tough basically. That's what I get for not hearing the first time.

[The Court]: Do you want to take him as a preemptory? I don't think you got [sic] cause[,] [defense counsel] fixed it for you.

[The State]:  Uh, I'll go ahead and do a preemptory.

[The Court]: Okay.

[Defense]:    May we ask for Batson – for Batson reason, cause he's –

[The State]: (Inaudible).

[Defense]:    Just to make my record.  He is African American, as is my client.

[The State]:  I – for the reason I stated earlier why I asked for it as cause.  He indicated that he – I thought he said he couldn't be fair.  The other reason would be that, um, he had, uh – he does have operation while suspended, two (2) of them which are crimes.  Now I – that's why I was trying to –

[The Court]: Okay.

[Defense]:    How does the State know that?

[The Court]: She looked it up.

[Defense]:    I don't have his name.

[The Court]: You have access, just like they have access, to his name.  I'll grant the challenge, but I'll note that you made the objection.

*Id.* at 40-41.[2]

## B. Standard of Review

"Upon appellate review, a trial court's decision concerning whether a peremptory challenge is discriminatory is given great deference[] and will be set aside only if found to be clearly erroneous." *Forrest v. State*, 757 N.E.2d 1003, 1004 (Ind. 2001). And under certain circumstances, which are not present here, we may review a *Batson* claim under the more rigorous standard of fundamental error. *Cartwright v. State*, 962 N.E.2d 1217, 1221 (Ind. 2012); *see, e.g.*, *Addison v. State*, 962 N.E.2d 1202, 1213 (Ind. 2012).

## C. Montgomery's *Batson* Objection

Before we address Montgomery's *Batson* claim, we initially note that, while we are convinced that Montgomery's challenge to the peremptory strike of Juror 78 has been adequately preserved for appellate review, the trial court did not afford the parties ample opportunity to present formal arguments regarding the State's peremptory strike and Montgomery's subsequent objection. Instead of entertaining formal arguments, the trial court solicited comments from the State as to whether the State intended to use a peremptory challenge and then interjected comments of its own, specifically: "Do you want to take him as a preemptory? I don't think you got [sic] cause[,] [defense counsel] fixed it for

---

[2] Although the record is not entirely clear, it does appear that defense counsel was unaware that Juror 78 had a criminal record.

you." Tr., Vol. 2 at 40. When the State offered its reason for the challenge, that the juror had committed crimes, and defense counsel inquired as to how the State obtained the information, the trial court stated: "She looked it up. . . . You have access, just like they have access, to his name." *Id.* at 41.

[18] It is well settled that colloquial comments do not amount to evidence, and attorney comments during trial do not constitute evidence. *See, e.g.*, *Campania Mgmt. Co. v. Rooks, Pitts & Poust*, 290 F.3d 843, 853 (7th Cir. 2002) (stating that "it is universally known that statements of attorneys are not evidence"). And, we are mindful that it was ultimately Montgomery's responsibility to provide us an adequate record to permit meaningful review of this matter. S*ee Wilhoite v. State,* 7 N.E.3d 350, 354-55 (Ind. Ct. App. 2014). Nevertheless, we take this opportunity to caution the trial court that the better course of action here would have been for the court to allow the parties to present formal arguments regarding the peremptory strike and the subsequent objection. We now address Montgomery's *Batson* claim.

## D. Montgomery's *Batson* Claim

[19] "Purposeful racial discrimination in selection of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure." *Batson v. Kentucky*, 476 U.S. 79, 86 (1986). The exclusion of even a sole prospective juror based on race, ethnicity, or gender violates the Fourteenth Amendment's Equal Protection Clause. *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008).

*Batson* adopted a procedure for "ferreting out discrimination in the exercise of peremptory challenges[.]" *Davis v. Ayala*, 135 S.Ct. 2187, 2208 (2015).

> First, the party contesting the peremptory challenge must make a prima facie showing of discrimination on the basis of race. Second, after the contesting party makes a prima facie showing of discrimination, the burden shifts to the party exercising its peremptory challenge to present a race-neutral explanation for using the challenge. Third, if a race-neutral explanation is proffered, the trial court must then decide whether the challenger has carried its burden of proving purposeful discrimination.

*Killebrew v. State,* 925 N.E.2d 399, 401 (Ind. Ct. App. 2010) (citation omitted), *trans. denied*.

> [T]his procedure places great responsibility in the hands of the trial judge, who is in the best position to determine whether a peremptory challenge is based on an impermissible factor. This is a difficult determination because of the nature of peremptory challenges: They are often based on subtle impressions and intangible factors.

*Davis,* 135 S.Ct. at 2208.

### *Step 1*

Montgomery argues that he satisfied the first step in the *Batson* process "because the juror was African[]American as is [Montgomery]." Br. of Appellant at 14. The State, however, argues that Montgomery "never established a *prima facie* case of racial discrimination" because the "only record made by [Montgomery] was that the peremptory strike he now challenges was used against an [African-

American] juror and that he was also [African American;]" "[t]his was the first peremptory strike used by the State[;] and [Montgomery] made no other record as to the number of African[-]American jurors in the panel being questioned or the jury pool as a whole." Brief of Appellee at 17-18.

[22] We note that the record before us does not provide how many African Americans were in the jury pool, and that, standing alone, the removal of some African-American jurors by peremptory challenge does not raise an inference of discrimination. *McCormick v. State*, 803 N.E.2d 1108, 1111 (Ind. 2004) (citing *Kent v. State*, 675 N.E.2d 332, 340 (Ind. 1996)). However, in this case, we need not decide whether Montgomery established a prima facie showing of discrimination. "[W]here, as here, a prosecutor has offered a race-neutral explanation for the peremptory challenge and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a *prima facie* showing of purposeful discrimination becomes moot." *Cartwright*, 962 N.E.2d at 1222; *accord Hernandez v. New York*, 500 U.S. 352, 359 (1991) (plurality opinion) (recognizing that in the *Batson* context, "where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant" (internal citations and brackets omitted)).

### Step 2

[23] At the second step, if the first-stage showing has been satisfied, the burden shifts to the prosecution to "'offer a race-neutral basis for striking the juror in

question.'" *Addison,* 962 N.E.2d at 1209 (quoting *Snyder*, 552 U.S. at 477). "[T]he race-neutral explanation must be more than a mere denial of improper motive, but it need not be persuasive, or even plausible. [T]he issue is the facial validity of the prosecutor's explanation." *McCormick,* 803 N.E.2d at 1110 (internal quotations and citation omitted). "A neutral explanation means an explanation based on something other than the race of the juror." *Id.* at 1111 (internal quotations and citation omitted). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Addison*, 962 N.E.2d at 1209 (internal quotations and citation omitted).

[24] Here, the prosecutor gave two reasons for striking Juror 78: because "[h]e indicated that he – I thought he said he couldn't be fair[,]" and because "he does have operation while suspended [sic], two (2) of them which are crimes." Tr., Vol. 2 at 41. These reasons are based on something other than the race of the juror, and, therefore, on its face are racially neutral. *See, e.g.*, *Cartwright*, 962 N.E.2d at 1223 (Ind. 2012) (State's proffered reasons for using peremptory strike against only African-American prospective juror, including that juror had been convicted of conversion, were race-neutral). The prosecutor did not run afoul of *Batson* for striking Juror 78 based on his criminal history.

### *Step 3*

[25] In the final step of the *Batson* process, the trial court "must determine whether the defendant has shown purposeful discrimination." *Addison*, 962 N.E.2d at 1209. This is a "duty" of the trial judge. *Id*. at 1210. The trial court must

evaluate the persuasiveness of the justification, and "[i]t is then that implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Id*. (internal quotation omitted).

[26] On this step,

> [Montgomery] respectfully alleges that a responsible inquiry by the trial court should have required the [State] to provide more information about how [it] obtained the basis for alleging that the juror had two convictions for Operation [sic] While Suspended or permitted more *voir dire* on the topic with this potential juror regarding the issue of having some sort of a criminal history.

Br. of Appellant at 14. Montgomery further argues

> that the justifications given by the State remain "implausible or fantastic" when [(1)] the prosecutor did not say that the witness couldn't be fair but said "I thought he said he couldn't be fair[,]" and [(2)] her representation about two crimes for Operation [sic] While Suspended were not confirmed by her own representation to the court that she looked up the information, or provid[ed] relevant cause numbers, etc.

*Id*. at 15. However, Montgomery's argument appears to confuse which party bears the burden of production and persuasion.

[27] At the third stage, the defendant may offer additional evidence to demonstrate that the proffered justification was pretextual, and the trial court assesses the credibility of the State's race-neutral explanation "in light of all evidence with a bearing on it." *Addison*, 962 N.E.2d at 1210. Although this third step involves the trial court evaluating "the persuasiveness of the justification" proffered by

the State, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Highler v. State*, 854 N.E.2d 823, 828 (Ind. 2006).

Here, Montgomery failed to offer additional evidence or argument to demonstrate the proffered justification was pretextual. Rather, Montgomery's argument focuses on the trial court's failure to require the State to provide more information on how it obtained Juror 78's criminal history and the trial court's failure to allow for additional voir dire on the topic. Given these circumstances, the deference to the trial court's superior position to weigh the reasons offered, and the defendant's burden to demonstrate pretext, we cannot conclude that the trial court committed clear error in overruling Montgomery's *Batson* objection to the State's peremptory strike of Juror 78. We therefore affirm the trial court's ruling on Montgomery's *Batson* challenge.

## II. Sufficiency of the Evidence

### A. Standard of Review

When considering the sufficiency of evidence, "a reviewing court does not reweigh the evidence or judge the credibility of the witnesses." *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005). We must affirm "if the probative evidence and reasonable inferences drawn from the evidence could have allowed a reasonable trier of fact to find the defendant guilty beyond a reasonable doubt." *Id.* at 126 (internal quotations omitted). It is well established that a verdict may be sustained based upon circumstantial evidence

alone if that circumstantial evidence supports an inference of guilt beyond a reasonable doubt. *Houston v. State*, 730 N.E.2d 1247, 1248 (Ind. 2000).

## B. Whether the Evidence Was Sufficient

[30] Montgomery admits that he was around A.M. at the time of her injuries, and he does not challenge the sufficiency of the evidence to prove that the battery or neglect of dependent offenses occurred. Rather, Montgomery:

> respectfully maintains that there was no direct evidence or sufficient circumstantial evidence to justify a finding that he is in fact that person that touched A.M. causing her injuries and therefore placing her in a situation endangering or [sic] life or health.

Br. of Appellant at 17.

[31] Montgomery was convicted of battery resulting in serious bodily injury and neglect of a dependent resulting in serious bodily injury, both Level 3 felonies. To obtain a conviction for the Level 3 battery charge, the State was required to prove beyond a reasonable doubt that Montgomery (1) was a person at least eighteen years of age (2) and knowingly or intentionally (3) touched (4) a person under fourteen years of age (5) in a rude, insolent or angry manner (6) resulting in serious bodily injury to the child. Ind. Code § 35-42-2-1(c)(1), (j). To obtain a conviction for the Level 3 neglect of a dependent charge, the State was required to prove beyond a reasonable doubt that Montgomery (1) had the care of a dependent and (2) knowingly or intentionally (3) placed the dependent in a situation endangering the dependent's life or health (4)

resulting in serious bodily injury. Ind. Code § 35-46-1-4(a)(1), (b)(2). The accused must have been subjectively aware of a high probability that he or she placed the dependent in a dangerous situation. *Armour v. State*, 479 N.E.2d 1294, 1297 (Ind. 1985).

[32] The State produced evidence that Montgomery was alone with A.M. on May 23 from around 8:00 a.m., when he dropped Jones off at work, to around 9:00 a.m., when he brought A.M. to Allison's home. Allison, who had Facetimed with A.M. before she was left alone with Montgomery, testified that A.M. was acting "just normal" sitting on Jones' lap and at one point was in "her little bouncy toy." Tr., Vol. 2 at 99. Jones also testified that A.M. was "perfectly fine" before she arrived at work that morning and that she did not break A.M.'s leg. Tr., Vol. 3 at 16.

[33] The State also presented evidence that A.M.'s injuries could not have been the result of an accident. Dr. Brown, the emergency room physician who initially treated A.M., testified that her injuries were the result of non-accidental trauma. The State produced the testimony of Dr. David Goertzen, an orthopedic trauma surgeon, who also testified that A.M.'s injuries were consistent with non-accidental trauma. Dr. Cortney Demetris, a pediatric hospitalist[3] and a child abuse pediatrician, opined that in order for the femur to have been broken

---

[3] Dr. Demetris testified that a pediatric hospitalist is "a Pediatric . . . doctor who takes care of only children who are hospitalized, but for any medical condition, not exclusively just around potential child abuse or neglect." Tr., Vol. 2 at 225.

in half, "significant force" would have had to have been applied to the leg and that a child of A.M.'s age would have been incapable of accidentally injuring themselves in such a way. Tr., Vol. 2 at 232.

[34] Moreover, the State presented evidence that the nature of A.M.'s injury would have prompted her to scream out in extreme pain and to do so at any time with even the slightest movement of her leg. A broken femur would have made a cracking sound loud enough to hear, and Montgomery would have felt the bone pop. However, Montgomery maintained that his vehicle was unreliable and that he only used it in emergencies as the reason he did not immediately bring A.M. to the hospital, even though he used the vehicle to bring Jones to work that morning and then later to bring A.M. to Allison's home.

[35] The facts presented here are similar to those of *Lindhorst v. State*, 90 N.E.3d 695 (Ind. Ct. App. 2017), wherein a child suffered an injury in the care of her babysitter. The child's father recalled that the child appeared normal and healthy that morning when he dropped the child off for day care. A few hours later, the babysitter informed the child's mother that the child fell on a wooden floor an hour before and that she was taking the child to the hospital. A CAT scan revealed the child had a fractured skull and cerebral bleeding, which numerous healthcare professionals opined could not have been the result of a fall onto a wooden floor. Further evidence was presented that the injury would have been obvious to the babysitter and that the babysitter delayed seeking necessary medical attention. The babysitter was convicted of battery and neglect of a dependent as Level 3 felonies. On appeal, the babysitter argued the

evidence was insufficient to support her convictions. A panel of this court concluded:

> It is perhaps possible that [the child's] injury was caused by an unusual "freak" accident, as described by [the babysitter]. But the finder of fact determined otherwise, and we may not reweigh the evidence as [the babysitter] requests. There is sufficient evidence to support the trial court's determination that [the babysitter] knowingly or intentionally inflicted the injury upon [the child] and that [the babysitter] knowingly or intentionally placed [the child] in a dangerous situation by delaying medical assistance. *See Hughes v. State*, 508 N.E.2d 1289, 1296 (Ind. Ct. App. 1987) (affirming conviction for battery on a child; sufficient circumstantial evidence established defendant battered the victim, despite defendant's claim the victim fell out of a crib), *trans. denied*; *Sample v. State*, 601 N.E.2d 457, 459-60 (Ind. Ct. App. 1992) (evidence sufficient to support conviction of neglect of a dependent; defendant unreasonably delayed getting medical help for infant in her care).

*Id.* at 702-03 (record citation omitted).

[36] Here too, we conclude that sufficient evidence was presented to permit a reasonable jury to find that Montgomery knowingly or intentionally inflicted the injury upon A.M. and that Montgomery knowingly or intentionally placed A.M. in a dangerous situation by delaying medical assistance. Montgomery's arguments to the contrary are little more than invitations to reweigh the evidence, which we will not do. *McHenry*, 820 N.E.2d at 126.

# III. Inappropriate Sentence

[37] Montgomery next argues his sentence is inappropriate in light of the nature of his offenses and his character. The trial court imposed two twelve-year sentences for the battery and the neglect of a dependent convictions to be served concurrently but consecutive to Montgomery's sentence in another case. Montgomery contends that the imposition of sentences "above the advisory sentence" was inappropriate. Br. of Appellant at 18.

## A. Standard of Review

[38] We may review and revise criminal sentences pursuant to the authority derived from Article 7, Section 6 of the Indiana Constitution. Indiana Appellate Rule 7(B) empowers us to revise a sentence "if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Because a trial court's judgment "should receive considerable deference[,]" our principal role is to "leaven the outliers." *Cardwell v. State*, 895 N.E.2d 1219, 1222-25 (Ind. 2008). "Such deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). The defendant bears the burden to persuade this court that his or her sentence is inappropriate, *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006), and we may look to any factors appearing in the record for such a determination, *Stokes v. State*, 947 N.E.2d 1033, 1038 (Ind. Ct. App. 2011), *trans. denied*.

*Reis v. State*, 88 N.E.3d 1099, 1101-02 (Ind. Ct. App. 2017). The question under Appellate Rule 7(B) analysis is "not whether another sentence is more appropriate" but rather "whether the sentence imposed is inappropriate." *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008). Whether a sentence is inappropriate "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell*, 895 N.E.2d at 1224.

[39] We begin with the advisory sentence in determining the appropriateness of a sentence. The advisory sentence for a Level 3 felony is nine years, with a minimum sentence of three years and a maximum sentence of sixteen years. Ind. Code § 35-50-2-5(b). Montgomery was sentenced to two twelve-year sentences to be served concurrently. Both of Montgomery's sentences were three years longer than the advisory sentence but four years shorter than the maximum sentence.

## B. Nature of the Offenses

[40] Notably, Montgomery has not offered an argument regarding the nature of his offenses, but they are egregious. While A.M. was in his care, Montgomery inflicted an extremely painful injury on the helpless infant, i.e., he broke her femur in two. According to doctors' testimony, the force required to break the bone, and the "crack[ing]" sound that would have accompanied the break, was such that Montgomery must have been aware that he hurt A.M., yet he unnecessarily delayed seeking medical treatment for the child. Upon her

eventual arrival at the hospital, it was determined that A.M. required pain medication and surgery, as she screamed in pain whenever she was moved. Due to the severity of the injury and the necessity for surgery, A.M. experienced a near-fatal-episode when, during the surgical procedure, she aspirated, went into cardiac arrest, required CPR, and had to be placed on a ventilator. To allow her bone to heal, A.M. had to be placed in a special immobilizing cast that "goes from the chest on the nipple line down to the lower leg, up to the ankle." Tr., Vol. 2 at 202. Given the nature of the offenses, we find that Montgomery's sentence is not inappropriate.

## C. Character of the Offender

[41] As to his character, Montgomery argues that he is a high school graduate; he was categorized as having a low risk to reoffend on the Indiana Risk Assessment tool; he lacks a juvenile offender history; and his "only adult [criminal ] history was from [cause number 02D04-1705-F6-560 ("F6-560")[.]" Br. of Appellant at 18. Under cause number F6-560, Montgomery was charged with resisting law enforcement and criminal recklessness as Level 6 felonies, as well as the following offenses as misdemeanors: carrying a handgun without a license, leaving the scene of an accident, and refusal to identify self.

[42] However, when Montgomery hurt A.M. he was twenty-five years old, and, as the trial court noted at sentencing, "You're clearly old enough to know better. . . . [Y]ou are six foot two (6'2") a hundred and seventy-five (175) pounds, clearly no match for a little seven (7) month old baby." Tr., Vol. 3 at 78. Montgomery violated a position of trust with A.M. Instead of caring for his

seven-month-old daughter, he seriously injured her. As the trial court further noted, "You promised her to protect her and to keep her safe[,] and in State's Exhibit 5, this is your handy work, Mr. Montgomery. You put her on a ventilator and broke her femur. That's hardly protecting your daughter." *Id.* Montgomery must have been aware that he inflicted the injury and caused his child a significant amount of pain, yet he feigned ignorance regarding the injury, delayed medical treatment, and did not accompany A.M. to the hospital. Regarding cause number F6-560, Montgomery's "only adult [criminal] history[,]" Montgomery was eventually convicted of Level 6 felony resisting law enforcement, misdemeanor carrying a handgun without a license, and misdemeanor refusal to identify self – offenses he committed just one week prior to committing the battery and neglect offenses against A.M. Br. of Appellant at 18. Montgomery's character does not warrant a reduction in his sentence.

[43] Given the nature of Montgomery's offenses and his character, we conclude that Montgomery's sentence is not inappropriate. We decline to revise it under Appellate Rule 7(B).

# IV. Abuse of Discretion

[44] Finally, interspersed within his inappropriate sentence argument, Montgomery argues the trial court abused its discretion at sentencing. When sentencing Montgomery, the trial court discussed mitigating and aggravating

circumstances and then imposed the sentence. The trial court stated, in relevant

part, as follows:

> Your Attorney has asked that I consider mitigating
> circumstances, Mr. Montgomery. He's asked that I consider that
> you're likely to respond affirmatively to probation or community
> supervision. I decline to do that. He's also asked that I consider
> your age of twenty-five (25) as being a mitigator. Well I decline
> to do that, Mr. Montgomery. You're twenty-five (25) years old.
> You're clearly old enough to know better. Um, you are six foot
> two (6'2") a hundred and seventy-five (175) pounds, clearly no
> match for a little seven (7) month old baby. He's also asked that
> I consider that you're – as your character you're unlikely to
> commit more crime. Based on the comments of Detective
> Sutphin and the after trial numerous iPad messages I decline to
> do that as well.[4] I do find as an aggravating circumstance is the
> extreme young age of the victim being seven (7) months old. I
> realize that neglect of a dependent, any dependent under fourteen
> (14) is considered a dependent, but this little girl was only seven
> (7) months old. You have a prior criminal record. I agree with
> your Attorney it's a felony and a couple of misdemeanor
> convictions that happened at the same time, but you do have a
> criminal record. And you violated the position of trust that you
> have with your daughter. You promised her to protect her and to
> keep her safe and in State's Exhibit 5, this is your handy work,
> Mr. Montgomery. You put her on a ventilator and broke her
> femur. That's hardly protecting your daughter. It's therefore
> ordered that the defendant be committed to the Indiana
> Department of Correction for classification and confinement for
> a period of twelve (12) years on Count I, and a period of twelve

---

[4] Testimony was presented at trial, indicating that through jail house phone calls and iPad messages, Montgomery attempted to "[manipulate] Khashira Jones, the mother of the victim, uh, attempting to steer her away from her family who would support her in this situation. And it appears that he is trying to manipulate her towards his own agenda in still attempting to get out of what he is responsible for in this situation." Tr., Vol. 3 at 74.

(12) years on Count II. Order those to be served concurrently, but consecutive to [F6-560].

Tr., Vol. 3 at 78-79.

## A. Standard of Review

[45] Sentencing decisions rest within the sound discretion of the trial court and are reviewed on appeal only for an abuse of discretion. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007). An abuse of discretion occurs if the decision is "clearly against the logic and effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom." *Id*. The trial court can abuse its discretion by (1) issuing an inadequate sentencing statement, (2) finding aggravating or mitigating factors that are not supported by the record, (3) omitting factors that are clearly supported by the record and advanced for consideration, (4) or by finding factors that are improper as a matter of law. *Laster v. State*, 956 N.E.2d 187, 193 (Ind. Ct. App. 2011).

## B. Mitigators

[46] Montgomery first contends that the trial court erred when it "declined" to consider the following mitigating circumstances that, according to Montgomery were "justified[,]" particularly: Montgomery had not previously been provided the opportunity to participate in probation; he was perhaps likely to respond well to short-term imprisonment, community supervision, or probation; he was

young, twenty-five years old, when he committed the offenses; and he was unlikely to commit more crimes. Br. of Appellant at 20.

[47] The finding of mitigating factors is not mandatory and rests within the discretion of the trial court, and the trial court is not required to accept the defendant's arguments as to what constitutes a mitigating factor. *Flickner v. State,* 908 N.E.2d 270, 273 (Ind. Ct. App. 2009). Further, the trial court is not required to give the same weight to proffered mitigating factors as the defendant does, nor is it obligated to explain why it did not find a factor to be significantly mitigating. *Id.* On appeal, a defendant must show that the proposed mitigating circumstance is both significant and clearly supported by the record. *Rawson v. State*, 865 N.E.2d 1049, 1056 (Ind. Ct. App. 2007) (internal citations omitted), *trans. denied*.

[48] Here, the record demonstrates that the trial court carefully considered Montgomery's proposed mitigating circumstances and determined that they deserved no weight. Montgomery has not shown that his proposed mitigators are both significant and clearly supported by the record, and he has failed to point us to any error sufficient to overcome the trial court's discretion on this point. Accordingly, we find the trial court did not abuse its discretion in determining that Montgomery's proposed mitigating circumstances were not significant.

# C. Aggravators

[49] Montgomery also contends that the trial court erred in finding A.M.'s young age and Montgomery's criminal history as aggravating circumstances when it decided the sentence.

## *1. Age of Victim*

[50] Generally, where the age of the victim is a material element of the crime, the age of the victim may not be used as an aggravating circumstance. *Kien v. State*, 782 N.E.2d 398, 414 (Ind. Ct. App. 2003) (citing *Stewart v. State,* 531 N.E.2d 1146, 1150 (Ind. 1988)), *trans. denied*. "However, the trial court may properly consider the particularized circumstances of the material elements of the crime" to be an aggravating factor. *Id.* For example, a trial court may properly consider as aggravating the age of the victim when the trial court considers that the victim was of a "tender age." *Id.* Moreover, the provisions of Indiana Code section 35-38-1-7.1(a)(3) state that whether the victim was less than twelve or more than sixty-five years old is an aggravating circumstance the sentencing court may consider.

[51] Here, the trial court noted that Montgomery is "six foot two (6'2") a hundred and seventy-five (175) pounds, clearly no match for a little seven (7) month old baby" and that "I do find as an aggravating circumstance . . . the extreme young age of the victim being seven (7) months old. I realize that neglect of a dependent, any dependent under fourteen (14) is considered a dependent, but this little girl was only seven (7) months old." Tr., Vol. 3 at 78. It is clear that

the trial court's finding concerning A.M.'s age was linked to the particular circumstances of this case, i.e., A.M.'s "extreme" young age. *Id.* As such, the trial court did not abuse its discretion by identifying A.M.'s age as an aggravating circumstance. *See, e.g.*, *Reyes v. State,* 909 N.E.2d 1124, 1128 (Ind. Ct. App. 2009) (finding no error in the trial court's use of the nine-year-old victim's age as an aggravating circumstance).

### *2. Criminal History*

[52] Regarding the trial court's use of Montgomery's criminal history as an aggravating circumstance, his challenge is nothing more than a request to review the weight that the trial court applied to this aggravating circumstance, which we will not do. *See Anglemyer*, 868 N.E.2d at 491 (explaining that relative weight given to aggravating and mitigating factors is not subject to review). Thus, we conclude that the trial court did not abuse its discretion by considering Montgomery's criminal history as an aggravating factor.

## D. Consecutive Sentences

[53] Lastly, Montgomery argues that the trial court erred in ordering his sentence in the instant case to be served consecutive to the sentence imposed in cause number F6-560 because he was not on bond for cause number F6-560 when he committed the instant offenses.

[54] Montgomery's presentence investigation report indicated (apparently inaccurately) that he was on bond for the prior case when he committed the

instant offense and that, therefore, under Indiana Code section 35-50-1-2(e),[5] the trial court would have been required to order consecutive sentences. However, at the sentencing, Montgomery argued that he was not in fact on bond at the time the instant offenses were committed because the case that would become F6-560 had been dismissed *before* the date Montgomery committed the instant offenses and was re-filed afterward. The trial court appeared to accept Montgomery's explanation; the State then requested consecutive sentences "regardless[,]" Tr., Vol. 3 at 65, and the trial court imposed consecutive sentences. .

[55] While Montgomery contends that the trial court abused its discretion by imposing consecutive sentences, he has failed to offer any cogent argument in support of this assertion. Consequently, he has waived the argument. *See, e.g., Cooper v. State*, 854 N.E.2d 831, 834 n.1 (Ind. 2006); Ind. Appellate Rule 46(A)(8)(a). Waiver notwithstanding, in order to impose consecutive sentences, the trial court must find at least one aggravating circumstance. *Marcum v. State*, 725 N.E.2d 852, 864 (Ind. 2000). Here, the trial court found three: Montgomery's criminal history, the "extreme young age of the victim[,]" and his violation of a position of trust. Tr., Vol. 3 at 78. We, therefore, conclude that the trial court did not abuse its discretion by imposing consecutive

---

[5] Indiana Code section 35-50-1-2(e) provides in relevant part as follows: "If, after being arrested for one (1) crime, a person commits another crime: . . . while the person is released: . . . on bond; the terms of imprisonment for the crimes shall be served consecutively, regardless of the order in which the crimes are tried and sentences are imposed."

sentences. *See* Ind. Code § 35-38-1-7.1 (listing violation of a position of trust, age of victim, and criminal history as aggravating factors).

### E. Probation Department's Recommended Sentence

[56] Montgomery also appears to argue that the trial court abused its discretion when it declined to accept the probation department's recommended sentence provided in the presentence investigation report, i.e., that Montgomery be committed to the Indiana Department of Correction for twelve years, with ten years executed, two years suspended, and two years served on probation with no objection to alternative sentencing, if eligible. The State "concur[red]" with the probation department's recommendation, but "vehemently oppose[d] alternative sentencing . . . ." Tr., Vol. 3 at 76. However, the trial court is under no obligation to base its sentencing determination on the presentence investigation report or on the probation department's sentencing recommendation. *Fugate v. State,* 516 N.E.2d 75, 80 (Ind. Ct. App. 1987). And, in any event, the court's deviation from the sentence recommended by the probation department was not significant as the trial court ultimately sentenced Montgomery to concurrent twelve-year sentences, to be served consecutive to Montgomery's one year and 183 day sentence in cause number F6-560. We cannot say the trial court abused its discretion on this issue.

## Conclusion

[57] In conclusion, the trial court did not violate Montgomery's constitutional right to an impartial jury, the State presented sufficient evidence to support his

convictions, his sentence is not inappropriate, and the trial court did not abuse its discretion at sentencing or in ordering consecutive sentences.

[58]   Affirmed.

Najam, J., and Crone, J., concur.