

FILED

May 18 2023, 8:52 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Thomas C. Buchanan
Buchanan & Bruggenschmidt, P.C.
Zionsville, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General

Courtney Staton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Elijah Mills,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

May 18, 2023

Court of Appeals Case No.
22A-CR-1392

Appeal from the
Hamilton Circuit Court

The Honorable
Paul A. Felix, Judge

Trial Court Cause No.
29C01-1911-F1-9633

**Opinion by Judge Vaidik**
Judges Tavitas and Foley concur.

**Vaidik, Judge.**

# Case Summary

[1]   In 2020, our Supreme Court issued *Wadle v. State*, 151 N.E.3d 227 (Ind. 2020), and *Powell v. State*, 151 N.E.3d 256 (Ind. 2020), overhauling Indiana double-jeopardy law and eliminating the constitutional and common-law analyses through which we previously determined substantive double jeopardy. In place of these analyses, the Court articulated new tests focused on statutory intent. In *Wadle*, the court addressed cases when a defendant's single act or transaction implicates multiple criminal statutes. The *Wadle* test requires courts to first determine whether the statutes allow multiple punishments for the charged offenses. If so, there is no double jeopardy, but if not, the courts then look to our included-offense statutes to determine whether one of the offenses is included—either inherently or as charged—in another. If not, there is no double jeopardy. Neither of these steps allows us to look at the evidence presented at trial. Only if the court has determined that an offense is included in another—inherently or as charged—should the court go on to look at the evidence presented to determine whether the defendant's actions constitute a single transaction or separate and distinct crimes.

[2]   Here, after the death of his son L.M., Elijah Mills was found guilty of Level 1 felony neglect of a dependent resulting in catastrophic injury or death and Level 3 felony battery resulting in serious bodily injury. The statutes of these offenses do not expressly permit multiple punishments, but Mills does not assert the

offenses are included inherently or as charged. Instead, he argues the offenses are included because the facts established at trial show the State used the same act—his battery of L.M.—to prove both offenses. But *Wadle* does not permit us to look to the evidence presented at trial to determine whether an offense is included in another for purposes of substantive double jeopardy. As such, we find no double-jeopardy violation here and affirm on this and all other issues.

## Facts and Procedural History

[3]     L.M., born in January 2015, was the biological son of Mills and Brittany Pearson. In 2018, L.M. lived with Mills and his girlfriend, Taylor Abrams, with Pearson exercising parenting time. In March of that year, Pearson noticed bruises on L.M.'s back, buttocks, and thighs and took him to the hospital. The Department of Child Services (DCS) was notified, and Ne'Cole Whyde, a DCS case manager, investigated. Whyde spoke with Mills, who admitted he "whooped" L.M. with a belt for saying "damn." Tr. Vol. II p. 14. Whyde concluded Mills caused the bruising, substantiated the claim of physical abuse, and removed L.M. from the home. A few days later, Mills retracted his statements and told Whyde that the bruising was caused by a "fall down the stairs." Tr. Vol. III p. 149. L.M. was returned to Mills's care in April.

[4]     In September, Pearson noticed bruises on L.M.'s lower abdomen and thighs. The next month, DCS Family Case Manager (FCM) Thomas Brown investigated, but Mills initially refused to speak with him without an attorney. Based on the timing of the injuries, Brown determined L.M. received them

while in Mills's care. Mills later suggested to Brown that this bruising may have occurred when L.M. was playing with another child. Nonetheless, Brown had "severe concerns with [L.M.'s] safety in the care of [Mills] and [Abrams]" and made a formal report raising claims of physical abuse against them. *Id.* at 173. However, the claims were never substantiated, and the matter was closed a few weeks later.

[5] In the summer and fall of 2019, Pearson again began noticing bruises on L.M. and that he was getting "skinnier." *Id.* at 113. Around this time, several other people expressed concern about L.M. Rumer Beck, Mills's friend, was asked to babysit L.M., and when she arrived Abrams said that L.M. was being punished and had to stand in the corner with his arms raised. When Beck expressed concern about the punishment, she was told "that was what they wanted for their child." Tr. Vol. IV p. 127. Later that night, Mills returned home "angry" and "[f]rustrated" and took L.M. into a bedroom, where Beck heard "swat[ting]" and "smacking" sounds and L.M. "crying out for his mother" for about "25 minutes." *Id.* at 115-16, 213.

[6] In August, law enforcement conducted a welfare check at Mills's apartment after Austin Murrell, who lived in the apartment below Mills, reported hearing "a kid screaming for help" from Mills's apartment and a male voice "yelling [L.M.'s] name" several times. *Id.* at 168, 169. Officers noted nothing of concern during the check. In October, Tamara Hodgkin, another friend of Mills, became so concerned about L.M. that she made a report to DCS. She reported that Mills and Abrams withheld food and water from L.M. as punishment and

would taunt him with food and that L.M. had bruises on his face and was limping. DCS attempted to investigate these claims, but Mills was uncooperative and would not allow photographs or for L.M. to talk to DCS.

[7] Around 7:00 a.m. on November 12, the Noblesville Police Department received a call regarding a child who was in cardiac arrest at Mills's home. Officers arrived to find Mills performing chest compressions on L.M., who was unresponsive and lying on his back on the living-room floor. Abrams was also in the home and had called 911. When medical personnel arrived, they noted L.M. had bruising across his face, torso, and inner thighs, all at various stages of healing, as well as abrasions to his knees and scarring "all over his body." Tr. Vol. III p. 73. L.M., who was nearly five years old, appeared severely malnourished and weighed only twenty-nine pounds, approximately the size of a two-year-old.

[8] L.M. was taken to Riverview Hospital, where he was placed on a breathing tube and then quickly transferred to Riley Hospital for Children due to the severity of his injuries. After "extensive" testing, doctors determined he suffered "subdural hematomas overlying both hemispheres of his brain," bleeding outside the spinal cord, retinal hemorrhages, heterotopic ossification on his thighs and back,[1] and a "healing injury" of the left forearm. *Id.* at 236-37. Doctors determined he was "critically ill," his likelihood of "meaningful

---

[1] Heterotopic ossification refers to "bone growth or bone development . . . in areas of the body it shouldn't be" such as in soft tissue or muscle. Tr. Vol. III p. 237.

neurological and developmental recovery was very low," and it was "unlikely that he would survive." Tr. Vol. IV pp. 4-5.

[9] Mills gave various explanations for L.M.'s injuries. He told medical personnel who first responded to the home that L.M. had not experienced any trauma or accidents that could explain his injuries. He told FCM Holly McCombs, who went to Riley Hospital after a report was filed with DCS, that he had spanked L.M. that morning for wetting himself and that—as forms of discipline—he "pinch[ed]" L.M. on the thigh and forced him to exercise. *Id.* at 230. When interviewed by police at the hospital, he claimed L.M. had been experiencing headaches and had recently fallen in the home and at the park. The next day, Mills called Detective Michael Haskett of the Noblesville Police Department and gave more information about the time leading up to the 911 call. He stated that morning he forced L.M. to run as a punishment, that L.M. fell while running and hit his head, that this happened several times, and that Mills made L.M. continue to run even after the falls. He also stated he "popped" L.M. on the head when he refused to run anymore. Ex. 86, 2:38. Later in the call, the two discussed what could have caused the injuries, and Detective Haskett told Mills to let him know if he could think of anything else. Mills then reiterated that L.M. fell "on his face" while running. *Id.* at 8:09.

[10] The State charged Mills with Level 1 felony neglect of a dependent resulting in catastrophic injury or death and Level 3 felony battery resulting in serious bodily injury to a person less than fourteen years old.[2]

[11] L.M. spent almost two months at Riley Hospital, and his condition improved enough that he could breathe on his own. In January 2020, he was released from the hospital and placed in foster care. However, he never regained the ability to walk, talk, or eat, his neurological function did not improve, and he suffered from seizures and often struggled to breathe on his own. In November, L.M. contracted pneumonia and was placed on a ventilator. He continued to deteriorate, and doctors at Riley Hospital determined aggressive medical care would not be in L.M.'s best interests, given his poor quality of life and limited life span. L.M.'s breathing tube was removed on December 13, 2020, and soon after he died. L.M.'s cause of death was listed as respiratory failure with traumatic brain injury as an underlying condition. Thereafter, the State amended the charging information to add a count of Level 2 felony battery resulting in death to a person less than fourteen years old.

[12] In September 2021, the State filed notice of its intention to present evidence of the 2018 DCS investigations. Mills objected under Indiana Evidence Rule 404(b). Both parties submitted briefs on the issue, and a hearing was held. In

---

[2] The State charged Abrams with Level 1 felony neglect of a dependent resulting in catastrophic injury or death and Class B misdemeanor failure to make a report. These charges were still pending at the time of Mills's trial. Abrams later pled guilty to Level 3 felony neglect of a dependent resulting in serious bodily injury and received a nine-year sentence.

part, the State argued that the evidence was relevant to show that L.M.'s injuries were not the result of an accident. The trial court then issued an order permitting the introduction of the evidence to disprove Mills's contentions that L.M. "accidentally was injured." Appellant's App. Vol. II p. 158.

[13] A jury trial was held in April 2022. Over Mills's objections, multiple witnesses testified about the March and October 2018 DCS investigations. Dr. Ralph Hicks, a pediatrician specializing in child abuse at Riley Hospital, testified that he was asked by DCS in March 2018 to opine on the cause of the bruising on L.M.'s buttocks, thighs, and lower back. Dr. Hicks testified that Mills's explanation for the bruising—that L.M. had fallen down the stairs—was not consistent with the injuries and that the bruising appeared to have been caused by trauma with an object and was consistent with "inflicted injury." Tr. Vol. III p. 222. He also testified that in October 2018 he was asked to consult on L.M.'s case and again opined that the amount of bruising and its location did not match Mills's explanation.

[14] Finally, Dr. Hicks testified about the injuries sustained by L.M. in November 2019. He noted the injuries to L.M.'s thighs and back were caused by "significant or repeated trauma" and that these injuries and the forearm injury were likely older as they had partially healed. Tr. Vol. IV p. 3. As for the bleeding in L.M.'s brain, spine, and eyes, Dr. Hicks stated these injuries were caused by "forceful" blunt trauma and could not be explained by L.M. falling. Tr. Vol. III p. 247. Dr. Hicks also testified that when admitted to Riley Hospital L.M. had "chronic, ongoing malnutrition." *Id.* at 238. Ultimately, Dr. Hicks

opined that L.M.'s injuries "were characteristic of nonaccidental inflicted trauma." Tr. Vol. IV p. 7.

[15] Several witnesses also testified about their interactions with Mills on November 11 and 12. Beck testified that Mills, Abrams, and L.M. ate at the restaurant where she worked on the evening of November 11 and that L.M. seemed fine. She further testified that she called Mills around 2:00 a.m. the next morning, he said he was punishing L.M. for "soil[ing] himself," and she could hear L.M. "running" and "whimper[ing]" in the background. *Id.* at 120. Murrell, Mills's downstairs neighbor, testified that around 2:00 a.m. that morning he heard "a kid running back and forth" while "crying and screaming" in Mills's apartment. *Id.* at 173. He then heard a male voice telling the child to "shut the f*ck up." *Id.* at 174.

[16] The State also presented the phone call between Mills and Detective Haskett in which Mills admitted that he punished L.M. in the early morning of November 12 by making him run laps in his soiled clothing and that he hit L.M. on the head. Finally, the State played a jail call between Mills and a friend in which Mills talked about the case and stated, "I'm not totally innocent here." Ex. 78, 0:32-0:34.

[17] The jury found Mills guilty of all three counts. At sentencing, Mills asked the court to enter judgment only on Level 1 felony neglect of a dependent resulting in catastrophic injury or death, arguing that double jeopardy precluded convictions for all three offenses because Level 2 felony battery resulting in

death and Level 3 felony battery resulting in serious bodily injury are "lesser included[s]" of the Level 1 felony. Tr. Vol. V p. 136. The State agreed that the Level 2 felony battery should merge into the Level 1 felony neglect but contended that both the Level 1 felony neglect and Level 3 felony battery could stand. The court agreed and entered judgment only as to Level 1 felony neglect of a dependent resulting in catastrophic injury or death and Level 3 felony battery resulting in serious bodily injury.

[18] In his statement of allocution, Mills denied abusing L.M., contended he was being unfairly prosecuted "as a black male," and said L.M. was "murdered" by DCS. *Id.* at 149. The trial court found as mitigating circumstances that Mills "lived thirty-two years of [his] life as seemingly a good person" and "seemingly cared for [L.M.]." *Id.* at 154, 155. The trial court also found two aggravating factors: L.M.'s "tender age" and that Mills violated a protective order by contacting L.M. while he was hospitalized. *Id.* at 157.

[19] A key issue at sentencing was whether Mills's sentences should be run concurrently or consecutively. The probation department recommended Mills receive enhanced sentences—thirty-five years for the Level 1 felony and twelve years for the Level 3 felony—but that they run concurrently. Mills asked for minimum sentences (twenty years and three years) and that any sentences be served concurrently, arguing consecutive sentences were inappropriate because the neglect and battery convictions stemmed from one "episode of criminal conduct." *Id.* at 151. The State asked for maximum sentences on both convictions (forty years and sixteen years) and that they be served

consecutively, for a total sentence of fifty-six years. The State acknowledged "the battery itself that resulted in the serious bodily injury and catastrophic injury, the death, was that instance when [L.M.] received the brain injury" but argued that because the neglect conviction was based on other actions besides the battery (the partially healed injuries and the malnutrition), the sentences should run consecutively. *Id.* at 140.

[20] The court stated it "wouldn't be fair to sentence someone for . . . an exact same offense." *Id.* at 153. However, the court found the neglect "occurred over multiple months" and that this plus the aggravating factors warranted consecutive sentences. *Id.* at 155. The court sentenced Mills to thirty years for the Level 1 felony and nine years for the Level 3 felony, to be served consecutively, for a total sentence of thirty-nine years.

[21] Mills now appeals.

# Discussion and Decision

## I. Admission of Evidence

[22] Mills contends the trial court erred in admitting evidence about the March and October 2018 DCS investigations in violation of Evidence Rule 404(b). A trial court has broad discretion in ruling on the admissibility of evidence, and we will disturb its ruling only on a showing of abuse of discretion. *Corbett v. State*, 179 N.E.3d 475, 489 (Ind. Ct. App. 2021), *trans. denied*. When reviewing a

decision under an abuse-of-discretion standard, we will affirm if there is any evidence supporting the decision. *Id.*

[23] Evidence Rule 404(b) provides that evidence of a crime, wrong, or other act "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but it "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." The law governing the admissibility of other-acts evidence for "other purposes" requires a trial court to make three findings. *D.R.C. v. State*, 908 N.E.2d 215, 223 (Ind. 2009). First, the court must "determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act." *Id.* (citation omitted). Second, the court must determine that the proponent has sufficient proof that the person who allegedly committed the act did, in fact, commit the act. *Id.* And third, the court must balance the probative value of the evidence against its prejudicial effect pursuant to Evidence Rule 403. *Id.* Mills challenges all three of these findings.

[24] Mills first argues evidence of the 2018 DCS investigations should not have been admitted to show "lack of accident" because he claimed L.M.'s injuries were caused by an accident resulting from "L.M.'s conduct, not Mills' conduct." Appellant's Br. p. 26. In other words, Mills argues that Rule 404(b) evidence can be admitted only to show lack of accident when the defendant is alleging the charged harm was an accident caused by his own conduct (such as swinging

his arm and accidentally striking the victim), rather than by some other source (such as the victim falling). But the State argues Rule 404(b) evidence may be admitted to show lack of accident whenever a defendant asserts that the charged harm was caused accidentally, regardless of who caused the accident. We need not determine that issue here, because the record sufficiently shows that Mills made statements giving the State reliable assurance that he would place accident at issue, and that the alleged accident occurred at least in part due to his actions.

[25] The State may admit evidence to prove lack of accident under Rule 404(b) only where (1) the State has "reliable assurance that an accident defense will be raised" or (2) after the defendant places accident at issue at trial. *Fairbanks v. State*, 119 N.E.3d 564, 568 (Ind. 2019). Here, a day after L.M. was taken to Riley Hospital, Mills called Detective Haskett, and the two discussed Mills's actions on November 12 and possible causes of L.M.'s injuries. In this call, Mills admits he "popped" L.M. on the head shortly before L.M. collapsed and medical personnel were called. He also stated that on the morning of November 12 he forced L.M. to run laps and that L.M. fell several times while running and hit his head, but each time Mills forced him to get up and continue running. Each of these actions—hitting L.M. in the head and forcing him to run even after he had fallen and hit his head—was performed by Mills. And given these statements and the context of the conversation, the State had reliable assurance that Mills would place accident at issue.

Mills also argues there is insufficient proof he caused the injuries described in the 2018 DCS investigations. There must be sufficient proof from which a reasonable jury could find the uncharged conduct proven by a preponderance of the evidence. *Caldwell v. State*, 43 N.E.3d 258, 264 (Ind. Ct. App. 2015), *trans. denied*. Direct evidence that the defendant perpetrated the uncharged act is not required; rather, substantial circumstantial evidence of probative value is sufficient. *Id.* The injuries noted in the March 2018 investigation were bruises down L.M.'s back, buttocks, and legs. During that time, Mills was L.M.'s primary caretaker and admitted to a DCS employee that he spanked L.M. with a belt. Later, however, he claimed the injuries resulted from a fall. Dr. Hicks testified the pattern of the bruises suggested non-accidental injuries, and DCS substantiated abuse against Mills. The October 2018 investigation involved bruises to L.M.'s abdomen. Based on the timeline, these injuries were sustained while L.M. was in Mills's care. Mills explained these injuries, but Dr. Hicks testified these explanations were not consistent with the bruising. FCM Brown testified that, after investigating the issue, he felt compelled to make a formal report of child abuse. This is sufficient circumstantial evidence from which a jury could find Mills committed these acts by a preponderance of the evidence.

[27] Finally, Mills argues the evidence should have been excluded under Evidence Rule 403, which permits the trial court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." The trial court is afforded

wide latitude in weighing probative value against prejudice under Rule 403. *Freed v. State*, 954 N.E.2d 526, 531 (Ind. Ct. App. 2011). We will reverse the court's decision to admit only upon a showing of an abuse of discretion. *Id.* Trial courts may consider a broad range of factors in balancing probative value against the risk of unfair prejudice, including the similarity between the past crime and the charged crime. *Id.*

[28] Mills argues this evidence has low probative value because the injuries occurred over a year before the charged incident and were relatively minor. We disagree. The key issue in the case was whether L.M.'s injuries were caused by Mills or by some other source. Therefore, evidence that Mills had previously injured L.M. and claimed the injuries were caused by accidents is highly probative. He also argues that evidence of the prior uncharged conduct may have misled or confused the jury, and that such evidence "inflamed the jurors' passions." Appellant's Br. p. 28. Again, we cannot agree. As Mills points out, the injuries involved in the 2018 investigations were relatively minor compared to those sustained in November 2019; thus, any chance of confusing the issues or unfair prejudice is low. We cannot say the trial court erred in determining the probative value of the evidence is not substantially outweighed by the dangers enumerated in Rule 403. *See Ceaser v. State*, 964 N.E.2d 911, 917-18 (Ind. Ct. App. 2012) (court did not err in admitting evidence of prior abuse against child where it was highly probative, given the defendant was being accused of battering the same child in a similar way within a year timespan and was not

substantially outweighed by the threat of unfair prejudice associated with violence against a child), *trans. denied*.

[29] The trial court did not abuse its discretion in admitting evidence of the 2018 DCS investigations.

## II. Sufficiency of Evidence

[30] Mills next argues the evidence is insufficient to support his convictions. When reviewing sufficiency-of-the-evidence claims, we neither reweigh the evidence nor judge the credibility of witnesses. *Willis v. State*, 27 N.E.3d 1065, 1066 (Ind. 2015). We only consider the evidence supporting the verdict and any reasonable inferences that can be drawn from the evidence. *Id.* A conviction will be affirmed if there is substantial evidence of probative value to support each element of the offense such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id.*

[31] To convict Mills of Level 1 felony neglect, the State had to prove beyond a reasonable doubt that Mills, being at least eighteen years old and having the care of L.M., a dependent less than fourteen, knowingly placed L.M. in a situation that endangered his life or health, and which resulted in catastrophic injury or death. Ind. Code § 35-46-1-4; Appellant's App. Vol. II p. 24. To convict Mills of Level 3 felony battery, the State had to prove beyond a reasonable doubt that Mills, a person at least eighteen, knowingly or intentionally touched L.M., a person under fourteen, in a rude, insolent, or

angry manner, resulting in serious bodily injury. I.C. § 35-42-2-1; Appellant's App. Vol. II p. 24.

[32] Mills argues the State did not prove that he placed L.M. in a dangerous situation or touched him in a rude, insolent, or angry manner because "[n]o witness observed Mills inflict such trauma." Appellant's Br. p. 30. But such direct evidence is not required, as "a conviction may be sustained based on circumstantial evidence alone." *Lindhorst v. State*, 90 N.E.3d 695, 701 (Ind. Ct. App. 2017). And here, there is plenty of circumstantial evidence that Mills endangered and battered L.M. L.M. sustained serious injuries, including bilateral subdural hematomas, which Dr. Hicks testified were caused by blunt force trauma and were intentionally inflicted. L.M. received these injuries while in the sole care of Mills and his girlfriend, and two witnesses—Beck and Murrell—heard Mills punishing L.M. in the early morning of November 12. Mills gave inconsistent statements about how L.M. received these injuries, including falling at their home and at the park, but according to Dr. Hicks these explanations would not account for the severity of L.M.'s injuries. Mills later admitted to punishing L.M. in various ways on the morning of November 12, including "popping" L.M. on the head, and acknowledged in a jail call that he was "not totally innocent." This is sufficient circumstantial evidence linking him to L.M.'s injuries. *See Rohr v. State*, 866 N.E.2d 242, 249 (Ind. 2007) (evidence sufficient to show father battered son where son was in father's sole custody when the injuries occurred, the severity of the injuries did not match father's explanation, and father made incriminating statements).

[33] The evidence is sufficient to support Mills's convictions.

## III. Double Jeopardy

[34] Mills also argues that his convictions constitute double jeopardy. Specifically, he contends his Level 3 felony battery offense is "factually included" in his Level 1 felony neglect-of-a-dependent offense because "the State presented the same evidence"—namely, that Mills battered L.M.—to prove both convictions. Appellant's Reply Br. pp. 5, 6. The State responds that, pursuant to our Supreme Court's overhaul of double-jeopardy law laid out in *Wadle v. State*, 151 N.E.3d 227 (Ind. 2020), courts do not look to the evidence presented at trial to determine whether an offense is included in another. We agree.

[35] In *Wadle*, the Court set forth a new test for evaluating whether convictions under multiple statutes amount to double jeopardy. The first step is to determine whether "either statute clearly permits multiple punishment, whether expressly or by unmistakable implication." *Id.* at 253. If so, there is no double jeopardy. *Id.* Here, the parties do not dispute that neither the neglect-of-a-dependent statute nor the battery statute clearly permits multiple punishment.

[36] As such, we proceed to the next step, which requires that we "apply our included-offense statutes to determine whether the charged offenses are the same." *Id.* Indiana Code section 35-38-1-6 provides: "Whenever: (1) a defendant is charged with an offense and an included offense in separate counts; and (2) the defendant is found guilty of both counts; judgment and sentence may not be entered against the defendant for the included offense."

Indiana Code section 35-31.5-2-168 defines "included offense" as an offense that:

> (1) is established by proof of the same material elements or less than all the material elements required to establish the commission of the offense charged;
>
> (2) consists of an attempt to commit the offense charged or an offense otherwise included therein; or
>
> (3) differs from the offense charged only in the respect that a less serious harm or risk of harm to the same person, property, or public interest, or a lesser kind of culpability, is required to establish its commission.

"If neither offense is included in the other (either inherently or as charged), there is no violation of double jeopardy." *Wadle*, 151 N.E.3d at 253. "But if one offense is included in the other (either inherently or as charged), then the court must examine the facts underlying those offenses, as presented in the charging instrument and as adduced at trial." *Id.*

[37] An offense is "inherently included" if it "may be established by proof of the same material elements or less than all the material elements defining the crime charged" or if "the only feature distinguishing the two offenses is that a lesser culpability is required to establish the commission of the lesser offense." *Id.* at 251 n.30 (citation omitted). Mills does not claim that Level 3 battery is an inherently included offense of Level 1 neglect of a dependent. Nor does he claim that it is an included offense "as charged," that is, based on the way the

two offenses were set forth in the charging information. As such, there is no double-jeopardy violation, and our analysis ends here.

[38] Mills urges us to look beyond the statutory elements and charging information and determine whether the offenses are included "as adduced at trial." Appellant's Reply Br. p. 8. Specifically, he contends that at trial the only evidence of both "serious bodily injury" (required for the Level 3 felony battery) and "catastrophic injury or death" (required for the Level 1 felony neglect) was "the battery to L.M. via blunt force trauma" and thus the State used evidence of the same act to secure both convictions. Appellant's Br. p. 35.

[39] This argument requires us to look at the evidence presented at trial to determine whether the same evidence was used to support two different convictions. But *Wadle* does not permit us to do so. Again, *Wadle* states,

> If neither offense is an included offense of the other (either inherently or as charged), there is no violation of double jeopardy. If, however, one offense is included in the other (either inherently or as charged), the court must **then** look at the facts of the two crimes to determine whether the offenses are the same.

151 N.E.3d at 248 (emphasis added). Thus, once a court has determined an offense is not included inherently or "as charged" in another offense, there is no need to look at the evidence presented at trial. And here, because Mills does not

argue that based on the statutes or charging information the offenses are included, there is no double-jeopardy violation.[3]

[40] We acknowledge that this analysis may produce harsh results.[4] Had a defendant made Mills's argument just a few years ago, we likely would have found these convictions constituted double jeopardy. *See Bradley v. State*, 113 N.E.3d 742, 751 (Ind. Ct. App. 2018) (explaining that the common-law "very same act test" prohibits "[c]onviction and punishment for a crime which consists of the very same act as another crime for which the defendant has been convicted and punished" (citation omitted)), *trans. denied*. But we note that, perhaps contemplating the *Wadle* analysis would produce such scenarios, our Supreme Court suggested other avenues by which a defendant like Mills may seek

---

[3] Other panels of this Court have looked at the evidence presented at trial when determining whether an offense is "included" in another under *Wadle*. *See Phillips v. State*, 174 N.E.3d 635 (Ind. Ct. App. 2021), *trans. not sought*; *Harris v. State*, 186 N.E.3d 604 (Ind. Ct. App. 2022), *trans. not sought*; *A.W. v. State*, 192 N.E.3d 227 (Ind. Ct. App. 2022), *trans. granted*, *opinion vacated*, 205 N.E.3d 190 (Ind. 2023). For the reasons stated herein, we respectfully disagree. And, as noted, our Supreme Court has granted transfer in *A.W.*

[4] One particularly troubling consequence of *Wadle*'s emphasis on the charging information is it can create a scenario where whether the defendant's convictions constitute double jeopardy depends on the State's factual inclusions or omissions in the charging information. For example, in *Demby v. State*, 203 N.E.3d 1035 (Ind. Ct. App. 2021), *trans. denied*, we found the defendant's convictions for attempted murder and aggravated battery amounted to double jeopardy under *Wadle* because the offenses were included "as charged," evidenced by the State's factual allegations in the information that both offenses were committed by shooting the victim with a firearm. As we noted there, Demby benefited from the State's inclusion of these facts in the information, and had the State not done so, there likely would have been no double-jeopardy violation under *Wadle*. *See id.* at 1045 n.12. One potential solution to this problem may be found, as our Supreme Court mentioned in *Wadle*, in Article 1, Section 13 of the Indiana Constitution, which guarantees the defendant's right, in "all criminal prosecutions," to "demand the nature and cause of the accusation against him." Currently, criminal defendants are not entitled to specific factual allegations in the charging information. *See Gutenstein v. State*, 59 N.E.3d 984, 995 (Ind. Ct. App. 2016) ("The State is not required to include detailed factual allegations in a charging information."), *trans. denied*. But perhaps, in light of *Wadle*, this case law should be revamped to increase protections against double jeopardy.

protection from multiple overlapping convictions, such as state constitutional protections against excessive sentences, as explained more fully below.

[41] The trial court did not err in determining there is no double-jeopardy violation.

## IV. Sentence

[42] Finally, Mills argues his sentence is inappropriate and asks us to reduce it under Indiana Appellate Rule 7(B), which provides that an appellate court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." The court's role under Rule 7(B) is to "leaven the outliers," and "we reserve our 7(B) authority for exceptional cases." *Faith v. State*, 131 N.E.3d 158, 160 (Ind. 2019). "Whether a sentence is inappropriate ultimately turns on the culpability of the defendant, the severity of the crime, the damage done to others, and a myriad of other factors that come to light in a given case." *Thompson v. State*, 5 N.E.3d 383, 391 (Ind. Ct. App. 2014) (citing *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008)). Because we generally defer to the judgment of trial courts in sentencing matters, defendants must persuade us that their sentences are inappropriate. *Schaaf v. State*, 54 N.E.3d 1041, 1044-45 (Ind. Ct. App. 2016).

[43] The sentencing range for a Level 1 felony is twenty to forty years, with an advisory sentence of thirty years. I.C. § 35-50-2-4. The sentencing range for a Level 3 felony is three to sixteen years, with an advisory sentence of nine years. I.C. § 35-50-2-5. Here, the trial court sentenced Mills to the advisory sentence

for each conviction and ordered them to run consecutively, for a total sentence of thirty-nine years.

[44] As to the nature of the offenses, Mills admits L.M.'s injuries were severe but claims that his actions on November 12 were simply discipline that got out of hand. The record does not support this contention and instead shows prolonged abuse starting as early as March 2018, when Mills beat three-year-old L.M. with a belt, leaving severe bruising. Numerous witnesses testified that such physical "discipline" continued throughout 2018 and 2019. Mills also withheld food and drink from L.M.—to the point that L.M. was severely malnourished and approximately the size of a two-year-old despite being almost five years old. This abuse culminated in Mills's actions on November 12. When L.M. soiled himself, Mills forced him to run around the apartment in his soiled clothes in the middle of the night and "popped" him on the head. When L.M. was taken to Riley Hospital the next day, his injuries were severe, and many were in various stages of healing, suggesting ongoing abuse. This occurred despite two formal DCS investigations, a visit by law enforcement to do a welfare check on L.M., and voiced concern from friends—all of which surely alerted Mills that his actions were wrong. In short, the evidence doesn't support Mills's contention that his actions were a one-off and instead supports the State's contention that L.M. was essentially tortured for months by Mills, the person who was charged with caring for him, eventually leading to his death.

[45] As for his character, Mills argues that he has little criminal history. While his criminal history consists of just a few driving offenses, he did violate a

protective order by speaking to L.M. while he was hospitalized. Furthermore, Mills showed no remorse or responsibility for his actions, instead contending he was merely disciplining his four-year-old son, that DCS killed his son, and he was being unfairly prosecuted due to his race. None of this shows particularly good character.

[46] Mills argues that the sentences should be run concurrently given that both convictions involved his battery of L.M. As our Supreme Court noted in *Wadle*, even if not double jeopardy, "multiple punishments in a single trial raise concerns over excessiveness." 151 N.E.3d at 245. One way for trial courts to combat this "multiple punishment" issue is to take this into consideration during sentencing. *See id.* at 250-53 (noting Article 1, Section 16 and Article 7, Sections 4 and 6 of the Indiana Constitution—all of which involve protections in sentencing—provide protection from "multiple punishments in a single prosecution"). Often, this will take the form of concurrent sentences. But it does not have to. Here, instead of enhanced sentences—which were requested by the State, recommended by the probation department, and certainly supported by the facts of the case—the court imposed advisory sentences and ran them consecutively. It is clear from the record that in doing so the trial court took into consideration that the two convictions stemmed from the same underlying battery. Mills faced a maximum sentence of fifty-six years but received only thirty-nine. This shows proper consideration of the multiple-punishment issue by the trial court.

[47] Mills has failed to show this is an exceptional case requiring us to use our Rule 7(B) authority.

[48] Affirmed.

Tavitas, J., and Foley, J., concur.